Good morning, and may it please the court. Anne Finling for Plaintiff Jennifer Power. I'm here with co-counsel Lauren Channel. I'd like to reserve three minutes for rebuttal. Ms. Power is here today seeking reversal of summary judgment in favor of individual defendants, former officer King, former officer Tuccino, and former sergeant Gallardo. Ms. Power's husband, Monty Washburn, suffered heat stroke and died on a State of Arizona prison transport from Kingman, Arizona to Tucson, Arizona on June 20, 2019. So I have the factual framework for these events, which are somewhat complicated, I will admit. When the decision was made to send one or more prisoners from the facility in Kingman to the facility in Tucson, was that medically driven, that decision? Thank you, Your Honor, for that question. No, it is not. The testimony in this case is that the decision is made solely on transfer of patients to and from the private prison in order to make use of the beds that the State of Arizona had already paid for. So the transport between Tucson and Kingman was not for purposes of a medical transport, but because the state keeps a certain number. It's a bed space issue. And on that same, by that same token, these were low risk inmates, inmates who were on their way to being ultimately discharged, released from custody. So how does the warden fit into this? The warden. Isn't that Corizon? Oh, Corizon. Thank you, Your Honor. Corizon was the contracted health care provider currently in bankruptcy. The so the proceeding against Corizon has been stayed. However, the Corizon employee, Nadia Salazar, is an important witness in the case against these officers and against the sergeant. OK. Mr. Washburn's death was the result of deliberate indifference by the transport officers and their sergeant. Could you review for me the I know you your contention is both Officer King and Officer Ticino are culpable in this scenario. Is there a distinction in your mind between level of culpability between those two defendants, between King and Ticino? No, Your Honor, I would say that it is because of the variations in testimony as to what people were told. And in fact, I would say that with that, that's an issue that needs to be resolved by a jury. For example, Officer Ticino could not render aid to Mr. Washburn without Mr. King's participation. If Mr. King were driving, let me refine the question a little bit. There is a point at which, as I understand the record, that they we have a driver and then we have a observer, if you will. I don't know how we would describe it. And they switch at a certain critical point in this scenario. Is that a consequence at all? In other words, is that is in your mind, is the officer who's charged with observing in a different posture than the driver? Are they effectively operating as a unit? I think they are certainly in a separate position just relative to the facts in the case. But in terms of deliberate indifference, I would say no, that there that the theory of deliberate indifference is neither one of these officers through a six and a half hour trip, three hours of which Mr. Washburn was known to be in a serious medical condition. Neither officer took any step to ever render first aid or seek medical care for Mr. The problem area seems to be from Wickenburg to Tucson. That's correct, Your Honor. Because Washburn was still alive in Wickenburg. There is no question that he was alive. There had been a correctional facility with medical equipment at that point, and he had been moved over. We probably wouldn't be here. Not even just just that, but as they passed Perryville Prison, Mr. Washburn was still alive. Perryville is in Phoenix. Yes, I understand that. And he would still have been alive. So that was an alternative. Perryville was named after my family, so I know right where it is. But in Perryville is after Wickenburg. Perryville. Absolutely. Sixty minutes. My understanding is at Wickenburg to Chino, who up to that point was in a position to observe everyone in the prisoner population that was there, the group of people. And King switched. Correct. So King, my understanding from the team from Wickenburg to Tucson was driving. Correct. That's my understanding. Was he in a position to observe the difficulties that Washburn may have been having? Was he in a position to directly observe, to actually go eyes on? I would. That's not clear. But the fact that he it's our own common experience, which is why it's a very good thing about whether Chino was sharing with King while he was driving after Wickenburg, what he was seeing. Was there a difference in the information available to the two men after Wickenburg? That's kind of the question I think we're all trying to get. I don't think there was a difference in terms of the information was available. To what degree were they talking? I don't have there's no tape recording. There's no video. So we don't have evidence of that. Certainly, we took depositions. So there'd be something in the record that would bear one way or the other on that point. They were both in the in a driver's section of the vehicle, and there would be no reason to believe they were not communicating with one behind. There's a little probably a bit of an offset, but there would be it'd be no different than being in the front of the minivan. And both people in the front of the minivan know what's going on in the back of the minivan. I mean, it's not it was not as though King had no ability to know what was going on. And I don't think that's dispositive in this case, given that the bus begins to leave Wickenburg and Washburn is having difficulties. Yes. And there's communication between at least one officer inside the van and medical people down in somewhere in Tucson, right? That's incorrect, Your Honor. That's that's not the record in this case. The record in this case is that there was a telephone call made to the off-duty supervisor, which again, this is where the district court substituted its own view of the facts as opposed to the facts, because it's the district court concluded that it was reasonable to call the supervisor. Who made that call? Tuccino. Not King. I believe it was Tuccino. And and that's when the decision was made to proceed from Wickenburg and not to divert to Perryville. It was on the road past Wickenburg. Yes, that happened after Wickenburg. But just to clarify the record that the district court says that was the reasonable thing to do. In fact, the reasonable thing to do would have been to follow the policies of the Department of Corrections, which required him to contact central office dispatch so that medical personnel could be dispatched to the scene and assist. It was very clear in the record. It was very clear from the evidence what ultimately this the standard under Farmer is that they knew of the facts that gave rise to the serious medical condition and drew the inference from those facts that there was a serious medical condition. And that's the district court had trouble with whether or not that high standard was met. And I believe that the district court had trouble with that because the district court resolved some factual disputes in favor of the defendants rather than applying the correct summary judgment standard and drawing the inference in favor of the plaintiff in this case or the non-movement. In this case, the officer's actions, what they knew, there was an inmate on board the bus. The inmate testified. The district court gave little credence to the inmate's testimony, but the inmate was very clear in Wickenburg. He said, this guy is dying. You need to do something. That is information from which a reasonable jury could conclude that they were not acting reasonably. No reasonable officer could think you could ignore the fact that a person was in that level of distress. I'm sorry, Your Honor. Harp on this point of what each of these individuals knew, but you said an interesting use of a term. You said, well, at least the driver, and we were talking about King in this point, had the ability to know in this layout of the van. It's more than just ability to know. Doesn't there have to be, for a disputed issue of fact, doesn't there have to be something in the record that said he knew? Now, one may, it can be disputed, he can say, I didn't know, and then someone else says, oh, there was a communication to him. He was, but it's got to be more than the ability to know, isn't it? Well, you have to have facts from which a jury could conclude the ability to know, and the facts from which the jury could conclude an ability to know. So what are, any fact that shows the information was communicated to him? He, telephone calls were made in the, the calls were made in the driver area. Again, nothing could happen without the vehicle being stopped, and I think that the most persuasive bit of evidence on what the officers was thinking, this idea that they would go on, they would continue the trip even if Mr. Washburn died on the transport vehicle. Can you address Gallardo? I'm sorry? Can you address Gallardo? Certainly. I think there are two issues with Gallardo that are important to talk about. The first is whether he issued a lawful order, and that would be whether the officers could rely on his order. And for the reasons I said earlier, I would say it was not a lawful order. Also, his testimony that he was acting on medical advice. Well, it is very clear from the record that the LPN, who was the only medical person he talked to, unequivocally denied that she told him that he, that Mr. Washburn was okay to travel for three hours. There just is no, he said, Sergeant Gallardo says that he was told that. There's evidence that he did lots of things wrong that he shouldn't have done. But again, Farmer sets a very high standard for deliberate indifference claim in this context, which is that the person was aware of the objective facts that gave rise to the serious medical condition and drew the inference from those facts subjectively that the serious medical condition existed. How is that true as to Gallardo? Well, I think a reasonable jury could conclude that Sergeant Gallardo inserted three hour recommendation that was on his own initiative. He'll be fine for three hours. That didn't come from medical. We know that because the medical denies that. From that evidence, I think we can conclude that given the other information he had, the fact that he had training on the risk of heat exhaustion, that he was, he acted with deliberate indifference. Do you want to save some time? Oh, yes, I'm sorry. Thank you. Okay, so we'll hear first from Mr. Zerlout. Good morning, Your Honors. May it please the court. My name is Scott Zerlout. I represent defendants King and Ticino. There are a couple of points I wanted to emphasize before I do. Is there a conflict between those two? I'm sorry, Your Honor. Is there a conflict between King and Ticino? I'm not commenting on your representation, but is there a conflict in their positions? I don't believe that there is. There's nothing in the record that I perceive as conflicting between what their testimony is. Well, I mean, does the record establish that they had, again, I go back to the farmer standard because this is a Supreme Court. We got to say what they say. The farmer standard puts a lot of weight on what facts were known to the individual. Were the facts known to King and Ticino exactly the same or were there differences? Because if there's differences, then you could get a different analysis on the farmer. Well, there were differences and one of the things I wanted to clear up was the factual predicate of what the bus is like and where King was relative to Ticino. So picture a school bus and then between the driver's section and where King was sitting for most of the trip and a jump seat, which is where Ticino was sitting for most of the seat, there's a plexiglass wall with a locked gate, for lack of a better term, a door. Plexiglass with the little holes in it. But after that, there is another section of, I can't remember if it's four, it's either two or four rows of seats where there's another gate and I believe that's a chain link gate that divides the rest of the bus. All the inmates on this trip were sitting in that back portion of the bus. Was anyone in that middle portion between the gate and the plexiglass? No, until, I don't believe so, actually, so I probably shouldn't comment. I don't recall there being anything in the record that would lead me to say that anyone was in that middle section. Could they go past the plexiglass to the gate to see better what was happening? They could have. They could have. They did not? As far as I know, there's nothing in the record suggesting they did, other than the one place in the record where they breached the interior to fill up with water, which I believe is the WICU. The nub of this, at least to me, seems to be the point at which the decision was made to proceed from Wickenburg all the way to Tucson and not to divert to Perryville. And there does seem to be some factual dispute. But the individual who received information via a cell phone, I take it, was Ticino. Correct. King is up driving the vehicle. Correct. And the record's... My question, and I guess I could have asked this to the other side, what evidence is there that King exercised deliberate indifference to Washburn's condition? Well, none, Your Honor. King... The record does not establish that there was any conversation between Ticino and King regarding what was going on in the back. At least I don't recall there being. Thank you for providing that. King was able to overhear Ticino's side of the conversation with Sergeant Gallardo. And so that's the information that he had related. According to the record, Ticino never said to King, the medical people say, head to Tucson. Well, I'm not aware of specifically that being said, but I do believe that King was aware of the statement that they had three hours to get to Tucson, basically a three-hour window. Now, whether that was because he overheard that conversation or whether Ticino told him that, I don't know. And I don't recall what the record says there. But King did know that. So it had to come to him one way or the other. One last point, just so the panel is clear. This was not a medical transport. This was a... And when we're referring to beds, we're not referring to medical beds. We're referring to basically cells, in the beds themselves. The point that I wanted to emphasize is, regardless of whether King and Ticino knew of the risk, knew that Washburn was suffering a medical emergency, they did not disregard that risk. They took steps by contacting their supervisor, Sergeant Gallardo. And that's what the judge emphasized. At some point, Washburn started vomiting, right? Correct. When was that? Well, I believe there is evidence the first time he vomited was at or right after Wickenburg. The Judge Reyes, I think, correctly decided that that itself was not sufficient evidence for Ticino and King to know that Washburn was suffering a medical emergency. And to that extent, the only evidence that... The only point where it becomes obvious that he was suffering a medical emergency was when they were near Marana. Which, if you don't know Arizona, is about 20 minutes outside of Tucson. I promise you. I'm sorry? I promise you. I know where Marana is. Okay. Very good, Your Honor. That is the only point at which it became obvious. And we acknowledge that the case law says that although you can't have constructive knowledge of the risk, you can't infer it from the obviousness of the risk. The only point that it became obvious was in Marana, when they're hearing that the inmates had laid Washburn down, then claimed that he had stopped breathing, and then asked for a mask. There's some indication in the record that Washburn was taking a medication for schizophrenia that caused him to be more susceptible to heat issues. Is it your position that neither King nor Ticino knew anything about that? And if that's so, why not? Well, HIPAA regulations is why not. Officers are not provided information about the health and medical history and medical condition, general medical condition of inmates. If it's a non-medical transfer, I assume they know something if it's a medical transfer. Yes, I assume that would be different as well. So they did not know. There's nothing in the record that suggests that they did. I'm out of time. One last point. I wanted to address qualified immunity real quick. And it deals with the CPR issue. That's not before us, is it? Yes. QI is not before us. Yes. Yeah. So I'm out of time. It is in the brief. I'm sorry? You can answer. Okay. It is before you. It is raised in my answer brief. It was addressed. It was raised in the district court. Judge Reyes did not reach that issue because he didn't feel like he needed to. I did raise it. And in the- You've raised it as an alternative ground for affirmance- For affirming. Raised it as an alternative ground for dismissal below. Correct. Okay. Correct. I think we understand. May I? Okay. The point I wanted to address was not directly raised in my answer brief, but it was raised in the reply brief on qualified immunity where the appellant points out that there is plenty of case authorities saying that officers have a duty to perform CPR when presented with it, when they can. And I just wanted to stress that there is no case authority saying that they have to transport in rural Arizona two officers with a bus full of inmates. There is nothing that would have led them to believe they had a constitutional obligation to perform CPR. All right. Thank you, counsel. Thank you, your honor. We'll hear next from Mr. Willinchick. Did I pronounce that correctly? Yes, you did. All right. Morning, your honors. Welcome. I just want to change the focus a little bit here based on comments I heard in the short time I have. First of all, as to the comment that there was a serious medical condition, again, a lot of these issues are directly addressed in the court's order. The court said at page 11, the parties do not appear to dispute that Mr. Washburn had a serious medical need and the record showed he died from heat stroke. However, the court said there is a genuine issue of fact whether Mr. Washburn's medical issue constituted a serious medical need. So not a foregone conclusion that anybody here knew that he had, at the time, a serious medical need. I just want to clarify that. Who made the decision as to the route? The route? To go from Kingman to Tucson through Wickiup, Wickenburg, Phoenix, Tucson. That's a good question. I don't know, honestly, the answer to that. In June, when the temperatures were reaching 116. Yeah. Well, that's a good question. It wasn't really explored in the record, but it is a good question. I believe that they took the same route. I believe that they took up where they had problems as well. But as you know, my client... It wasn't done for security reasons? I don't think so. I don't think so. Okay. Yeah. But it's a good point. It wasn't raised. My client, of course, was off that day at home when he received these calls. And to be, again, brief, the question that I heard here, which was focused on by counsel, was whether Sergeant Gallardo had issued a lawful order. That's not something the court explored below, but I don't even know what that means, quite frankly. Yes, I think the answer is he issued an order to Ticino and King to continue on based on the medical advice he received. And I also want to... There's a dispute of fact, as I understand the record, between the nurse and Gallardo as to what the nature of that advice was. She says she was told nothing about the possibility of seizure, and he says that he did say that, so that's a classic factual issue. We have to take it in the light most favorable, which means the nurse, that he didn't say it, and so he left out a key piece of information that sort of undermines his whole medical advice that he received. Right. Well, of course, our position, that was before the court below, and the court didn't find that to be a material issue of fact because of a couple of reasons, as I recall it. One was that there's a lot of information on these kinds of issues that you are aware of that prisoners tend to say a lot of things to the officers in route about a lot of issues. And one of the pieces of testimony that I think is important in that regard was that they don't necessarily listen to everything the inmates say. They're not medically trained people. They say a lot of things to try to stop the buses a lot of times for various reasons. So the officers have to be very careful about what they hear. The point of that is, is that the officer reported that, and I can't remember off the top of my head, I think it was King, but I could be wrong, the officer reported that as part of his recitation to my client, Sergeant Gallardo, did not see the seizure himself, had no personal evidence of that, and made that point clear. So my client- On this believability notion, doesn't that go right into a dispute of fact? No, I don't think so. In other words, I understand what you say. Officers take with a grain of salt what they're hearing. That's fine. But then it's for the trier of fact to determine whether or not that became deliberate indifference or they had an understandable reason for disregarding the information. Well, again, what information? The information an inmate had reported, quote, his conclusion of a seizure when the officer didn't see it. So my client is not going to relay to the nurse information thirdhand from some inmate who's not necessarily a reliable source about what he claims as a conclusion happened. And the jury may well agree with you, but I don't see why it's not an issue of some dispute. Well, because it's not a material point. Nobody ever testified that it was a material point. I don't believe the nurse ever said, had I known that- Part of the problem is that, you know, Gallardo doesn't hear the thing directly from the inmate and take it with a grain of salt. It's already cleared the first officer who thought it was significant enough to mention the possibility of the seizure and pass that along to Gallardo. So I'm not sure this grain of salt- Well, and again, I don't know why there's even an issue of it because the issue is clearly he didn't do that deliberately to, again, punish, you know, Washburn. If he didn't say it, it wasn't a deliberate act of indifference to Washburn's needs. It was simply that he didn't think it was reliable information that he should pass on, which could actually twist her opinion of things. So the fact that he didn't say it is fair, but the point is, I don't recall that she ever testified or there was ever any expert testimony that would have made any difference in her diagnosis or in Eesley's diagnosis of what to do or how to react to the circumstance of where they were. Remind me, at some point, Lieutenant Baker countermands or overrides, I guess is a better word, what Gallardo had initially concluded. Yeah. Is there any significance to that? I don't think so, because at that point, I don't think there's any doubt that Gallardo would have probably done the same thing. I think at that stage, I think this was after Murano, where he was really exhibiting serious issues that the officers did note. I think at that point, Gallardo did not stand in the way of Baker making that order to make the order that he did. So I don't think that's really a material issue here that would reflect on Gallardo's deliberate indifference to the needs of the patient. And again, you know, you may say it's negligence that he didn't report the seizure part of it in the midst of what he was describing, but he wouldn't have been describing anything if he was deliberately indifferent. It would be my position. That's why I don't think it's really material. Can I just ask a question? Yeah. My understanding is that in contrast to King and Ciccino, Gallardo did not raise below as an alternative grounds for dismissal qualified immunity. Is that correct? He did not. That's correct. So anyway, just in the little time I have, let me just say this. The court held, for what it's worth, that Gallardo was not aware of particular susceptibility in a heat-related illness and that although he was informed that Washburn had vomited and other prisoners believed that Washburn had a seizure, which was not confirmed by Ciccino, based on what he heard from Ciccino, he did proceed to call Nurse Salazar, who consulted easily, et cetera. And she concluded he was suffering probably from dehydration. I don't think there's any testimony that that would have changed based on the fact that an inmate reported that he had had a seizure. And what does a seizure even mean? Who knows? So I don't think it was material to the issue, ultimately, of whether or not there was deliberate indifference. Clearly, he wouldn't have called at all twice out of concern had he been acting with deliberate indifference. Now, again, you may say he acted negligently in places, but that's preserved for the State Court. All right. Thank you, counsel. Thank you, Your Honor. We'll hear now rebuttal from Ms. Findlay. Thank you. Just to address a couple points, it's very clear that the order from Sergeant Gallardo was to come no matter what. I think that that order sets the context for this case. The testimony on the record was that there were no problems in communicating with the officers. The inmate testified, Mr. Ballantyne testified, that he had no problem communicating with the officers who were in the front passenger compartments, I mean, front driver compartments. So there is a question of fact regarding what the driver would have known. The driver, King, knew that there was a three-hour window, so there had to have been some communication with him. Again, that was a three-hour window to come no matter what, something that was repeated to the inmates. How many passengers, how many inmates were on the bus? Eleven. The evidence in this case, there's evidence from this case that a jury could conclude that these officers knew well before Marana that there was a problem. It was the testimony in this case from Michael Ballantyne is that it was obvious to the inmates. And remember what a serious medical need is. Serious medical need is something that has been diagnosed or would be obvious to a lay person. These inmates, these officers are not free to ignore inmates. They are certainly free to evaluate the truthfulness of an inmate. They are certainly free to say, you know, let me, I want to see this for myself. That's all fine. But they are not privileged to completely ignore information. That's a question of fact for the jury, and I see that my time is up. All right. Thank you, counsel. We thank counsel for both sides for their arguments in this case. And the case of Power v. State of Arizona is submitted for decision.
judges: HAWKINS, COLLINS, Seeborg